UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:09-cr-0293 WBS KJN P |
|---|---|
| Respondent, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| THOMAS TANKE, | |
| Movant. | |

I. Introduction

Movant is a federal prisoner, proceeding without counsel, with a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. Movant challenges his 2011 convictions for five counts of bank fraud (18 U.S.C. § 1344) and two counts of mail fraud (18 U.S.C. § 1341). Movant is serving a sentence of 70 months.

Movant challenges his convictions on the following grounds: 1) ineffective assistance of trial counsel (claims 1, 3, 4, 5, 7); 2) government failed to disclose exculpatory evidence (claim 2); and 3) ineffective assistance of appellate counsel (claim 6). For the reasons stated herein, the undersigned recommends that movant's motion be denied.

Factual Background

For purposes of these findings and recommendations, the undersigned adopts the factual summary contained in the order of the Ninth Circuit Court of Appeals affirming movant's
1

conviction:

### A. Tanke's Embezzlement

Rafael Martin and his family operated two construction businesses, Azteca Construction Company and Construction Equipment Rental and Service (CERS). Defendant Thomas Tanke worked for Azteca between 1999 and 2004, serving as vice president of operations between 2000 and July 2004, with authority to approve or issue checks from Azteca accounts. He was not employed by CERS and had no authority to receive CERS income or pay CERS's obligations. Tanke also maintained his own consulting business, Cedar Creek Associates.

Over a 20–month period, Tanke embezzled more than $192,000 from Azteca and CERS. From November 2002 through February 2004, Tanke caused the issuance of 21 Azteca checks, totaling $74,762.82, for his personal expenses. The Azteca checks, most signed by Tanke, were paid to his creditors or businesses he patronized, including General Motors Acceptance Corporation (for an auto lease), Audi Financial Services (financing for an Audi A4 Quattro), Capital One Services (for a credit card), Household Credit Services and HSBC Card Services, Inc. (for a credit card), Providian National Bank (for a credit card), Onyx Acceptance Corporation (financing for a BMW), Steve Larsen's Wheel Works (a retail bicycle shop) and Kenny G. and Company (a jeweler). Tanke was never authorized to use Azteca checks to pay personal obligations or to pay these specific creditors or businesses.

Tanke falsified records to conceal these payments. He used at least six false invoices to make it appear that the checks were issued for legitimate business expenses. For example, a false invoice from "Onyx Corporation," ostensibly for "[p]igging of lines and testing of all pipe," was actually a $10,027.92 payment for a BMW Z4. Tanke also falsified carbon copies of checks in Azteca's check register on at least 10 occasions, also to conceal the true nature of the payments. For example, a check made payable to "Providian" (to pay Tanke's personal Providian Visa card) contained no memo notation, whereas the carbon copy falsely stated that the check was paid to "Providian Products" and referenced "02420–0046–M," an existing Azteca job number and cost code.

Between February and July 2004, Tanke also diverted seven checks payable to CERS, Martin and Azteca, totaling $117,486.25, into his Cedar Creek bank account. The four checks payable to Martin and Azteca had a handwritten endorsement making the check payable to Cedar Creek, a forged signature and a printed endorsement making the check payable to Cedar Creek. The three checks payable to CERS had a printed endorsement making them payable to Cedar Creek.

### B. Cedar Creek Cover Story

Tanke left Azteca in July 2004. It appears that Martin at least suspected Tanke's embezzlement a short time later. In an August 5,

2

2004 email, Martin asked Tanke about a missing April 2004 check, in the amount of $39,330, from Southern Quality Trucks to CERS. Tanke responded by email that he did "not have any check from Southern Quality Trucks" and that all checks he had received had been turned over to accounting or used to pay outstanding vendors and debts. In fact, Tanke had long since deposited the check into his Cedar Creek account.

In an August 6 email, Martin told Tanke that he knew the check had been deposited into the Cedar Creek account. In an email response that day, Tanke acknowledged that he had diverted the money into his account, but told Martin that this and similar diversions were legitimate transactions to compensate him for consulting work Cedar Creek had allegedly performed for Azteca and CERS. Tanke's email attached what he claimed were three "very old invoices" from Cedar Creek and asserted that his actions had "ensured that Cedar Creek was paid for these long overdue invoices." In addition to casting the diversions as legitimate payments to Cedar Creek, Tanke's email also used thinly veiled threats to discourage Martin from reporting the matter to authorities. Tanke wrote that this was "purely a 'business issue' " and that he "hope[d Martin would] not try to expand it to anything else." Tanke warned that, if Martin pursued the matter further, he would report Martin to federal and state agencies, writing: "You do not want to see this happen, as it could involve you personally in criminal or civil action that could put you in prison or forfeit all of your personal holdings."

On August 17, Tanke emailed Martin that he should have received invoices by mail showing that over $98,000 was due to Cedar Creek for consulting fees. Tanke noted that Martin had filed documents leading to a hold on the Cedar Creek account and that, if Martin did not lift that hold, he would report Martin's "numerous frauds and false claims" to authorities. Tanke concluded the email by writing: "I just want what has been and is due to me and we can part friends. Please do not force me to take action that will cause you harm."

Martin replied by email on August 18 that the invoices were "not real," that Tanke was a salaried employee who received wages and that Azteca did not owe Tanke or Cedar Creek any consulting fees. Martin added, "[i]n response to your threats, if you ha[d] knowledge of any wrongdoing by Azteca ..., you should have reported it."

On September 16, Tanke caused a letter to be sent from Cedar Creek to Martin by U.S. mail. This mailing, charged as count 2 of the indictment, stated that Azteca and CERS had previously paid some invoices due to Cedar Creek (again, an apparent reference to Tanke's diversion of checks into his Cedar Creek account) and alleged that Azteca had provided "false information" to Cedar Creek's bank, which resulted in reversal of these payments. The letter enclosed an invoice from Cedar Creek that requested payment for the previous invoices as well as interest, totaling $159,990.95.

> In a letter dated September 23, Martin rejected the new invoice and stated that Azteca had never paid any of the previous fictitious invoices either. Martin later testified at trial that Cedar Creek did not perform any of the claimed services reflected on the September 16 Cedar Creek invoice. He also testified that neither Tanke nor Cedar Creek had ever consulted for CERS.
>
> C. Criminal Proceedings
>
> In 2009, a grand jury indicted Tanke on five counts of bank fraud, for violation of 18 U.S.C. § 1344, and two counts of mail fraud, for violation of 18 U.S.C. § 1341. The first mail fraud count, charged as count 1 of the indictment, was for a July 22, 2004 check from Industrial Tractor Co. to CERS for approximately $33,000, delivered via Federal Express from South Carolina to California. Tanke does not challenge his conviction on count 1. The second mail fraud count, charged as count 2 of the indictment, was for the September 16, 2004 mailing.
>
> A jury found Tanke guilty on all counts, and the district court sentenced him to 70 months' imprisonment, 60 months' supervised release and $243,403.96 in restitution. The Sentencing Guidelines range of 70–87 months reflected a 2–level enhancement for use of sophisticated means and another 2–level enhancement for misrepresentation or fraud during the course of a bankruptcy proceeding.

U.S. v. Tanke, 743 F.3d 1296, 1297-300 (9th Cir. 2014).

III.  Discussion

    A.  Claims 1, 3, 4, 5, 7

*Legal Standard for Ineffective Assistance of Counsel*

In Strickland v. Washington, the Supreme Court held that there are two components to an ineffective assistance of counsel claim: "deficient performance" and "prejudice." Strickland, 466 U.S. 668, 694 (1984). Establishing "deficient performance" requires the movant to show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. "Deficient performance" means representation that "fell below an objective standard of reasonableness." Stanley v. Cullen, 633 F.3d 852, 862 (9th Cir. 2011) (citing Strickland, 466 U.S. at 688).

"To demonstrate prejudice, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "It is not enough 'to show that the errors had some

conceivable effect on the outcome of the proceeding.'" Harrington v. Richter, 562 U.S. 86, 111-12 (2011) (quoting, Strickland, 466 U.S. at 693). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the movant as a result of the alleged deficiencies. Strickland, 466 U.S. at 697.

*Claim 1*

Movant alleges that counsel ineffectively failed to argue that the five year statute of limitations for the bank fraud counts had expired. (ECF No. 1 at 4.) Movant argues that "knowledge" of the offense was made known during the first week of June 2004. (Id.) Movant argues that the indictment was handed down on July 15, 2009, which was six weeks after the statute of limitations had expired. (Id.)

As noted by respondent in the opposition, the statute of limitations for bank fraud is ten years. See 18 U.S.C. § 3293; United States v. Najjor, 255 F.3d 979, 983 (9th Cir. 2001) ("Under 18 U.S.C. § 3293, the statute of limitations for violations of 18 U.S.C. § 1344 is ten years.") The indictment in this action was returned on July 16, 2009. (ECF No. 1.) The indictment alleged that each count of bank fraud transpired between February 2004 and June 2004. (Id. at 5.)

Because the indictment was returned within the ten year statute of limitations, movant's counsel was not ineffective for failing to argue that the bank fraud counts were barred by the statute of limitations.

*Claim 3*

Movant argues that counsel was ineffective for failing to raise a defense of "unclean hands." (ECF No. 109 at 7.) Respondent accurately summarizes this claim in the opposition.

> According to [movant], trial counsel was ineffective because he failed to raise a defense of "unclean hands" regarding the government's chief witness, Azteca President Rafael Martin. Per defendant: the trucks and equipment sold in South Carolina were actually owned by Azteca Construction (not CERS); President Martin had the checks for the sale of the equipment (later diverted by defendant) made out to himself and his wife's company (CERS) to avoid seizure for a previous past due debt of $5 million; all of the check evidence (that is, the diverted checks admitted into evidence) was "tainted by the unclean hands" of Martin; and that evidence should have been blocked from being used at trial." Mot. At 8.

(ECF No. 114 at 14.)

5

As noted by respondent, the doctrine of unclean hands is an affirmative defense in civil actions. The doctrine of unclean hands "bars relief to a plaintiff who has violated conscience, good faith or other equitable principles in his prior conduct, as well as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." Pom Wonderful LLC v. Welch Foods, Inc., 737 F.Supp.2d 1105, 1109 (C.D. Cal. 2010) (citing Dollar Systems, Inc. v. Avcar Leasing Systems, Inc., 890 F.2d 165, 173 (9th Cir. 1989).) The doctrine of unclean hands is not available as a defense in criminal cases. In addition, the undersigned is not aware of any case law prohibiting the admission of evidence from a witness with allegedly "unclean hands."

For these reasons, the undersigned finds that movant's counsel was not ineffective for failing to raise the defense of unclean hands.

*Claim 4*

Movant argues that trial counsel was ineffective for failing to assert that the prosecution was required to prove that he intended to defraud a bank. (ECF No. 109 at 8.) Movant also argues that trial counsel was ineffective for failing to request a jury instruction stating that in order to find him guilty of bank fraud, the jury had to find that he intended to defraud the bank. (Id.)

As noted by respondent, the jury instruction for bank fraud included the element of "intent to defraud":

> The defendant is charged in Counts Three, Four, Five Six and Seven of the Indictment with bank fraud in violation of Section 1344(1) and (2) of Title 18 of the United States Code. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt.
>
> First the defendant knowingly executed a scheme or plan to defraud a U.S. Bank, or a scheme or plan to obtain money or property from U.S. Bank by means of false or fraudulent pretenses, representations, or promises;
>
> Second, the promises or statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a financial institution to part with money or property;
>
> Third, the defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

Fourth, U.S. Bank was federally insured.

(ECF No. 114-1 at 223.)

Accordingly, trial counsel was not ineffective for failing to request an instruction regarding "intent to defraud," as the jury received such an instruction.

*Claim 5*

Movant argues that trial counsel was ineffective for failing to interview and call as witnesses staff from the Azteca accounting department. (ECF No. 109 at 10.) Movant argues that witnesses from the Azteca accounting department would have testified that movant and Azteca had an oral agreement for movant to perform consulting services for the Martin family companies, i.e., Azteca and CERS. (Id.)

In the opposition, respondent argues that movant's allegations that unspecified witnesses would have offered favorable testimony is insufficient. Respondent correctly argues that evidence must be submitted to demonstrate that the witnesses would have provided helpful evidence to the defense. See Dows v. Wood, 211 F.3d 480, 486–87 (9th Cir. 2000) (no ineffective assistance of counsel for failure to call an alleged alibi witnesses where the petitioner did not identify an actual witness, did not provide evidence that the witness would have testified and failed to present an affidavit from the alleged witness the petitioner now claimed should have been called to testify at trial); Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) (same); United States v. Harden, 846 F.2d 1229, 1231–32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call a witness where, among other things, there was no evidence in the record that the witness would have testified); United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987) (appellant failed to satisfy the prejudice prong with respect to his ineffective assistance of counsel claim because he offered no indication of which potential witnesses would have testified to or how their testimony might have changed the outcome of the hearing).

In the reply to the opposition, movant identifies the Azteca accounting department employees who would have allegedly testified in his favor: Dee Dunbar, Cynthia Glover and Tyna Domquiez. (ECF No. 121 at 15.) Movant argues that these three employees knew of the agreement between movant and the Martin companies for movant to provide consulting services.

7

1  (Id.)  Movant argues that these employees processed invoices from Cedar Creek (apparently for
2  these consulting services), made payments to Cedar Creek for these invoices, and authorized U.S.
3  Bank to accept checks endorsed from CERS and Martin to the Cedar Creek business account.
4  (Id.)
5  In the reply, movant identifies the witnesses he claims trial counsel failed to call and
6  describes their proposed testimony.  However, other than his own word, movant has presented no
7  evidence that the three alleged witnesses would have testified as alleged.  Movant has not
8  provided, for example, affidavits from any of these alleged witnesses.  Moreover, movant should
9  have identified such witnesses in his motion, not merely in his reply.  Accordingly, this claim of
10 ineffective assistance of counsel should be denied on grounds that movant has not adequately
11 demonstrated that he was prejudiced by counsel's failure to call the three witnesses alleged.
12 *Claim 7*
13 Movant argues that trial counsel was ineffective for failing to obtain a copy of the Azteca
14 bankruptcy transcript.  (ECF No. 109 at 12.)  Movant argues that this transcript would have
15 discredited the testimony of prosecution witness Martin.  (Id.)
16 As noted by respondent in the opposition, movant has made only conclusory allegations
17 that the trial transcript exists and that it would somehow contradict the testimony of prosecution
18 witness Martin.[1]  Respondent argues, and the undersigned agrees, that movant failed to allege any
19 specific facts which demonstrate what the alleged prior inconsistent testimony was and how it
20 would have contradicted Martin's trial testimony.  Such conclusory allegations do no merit relief
21 under 28 U.S.C. § 2255.  "It is well settled that '[c]onclusory allegations which are not supported
22 by a statement of specific facts do not warrant habeas relief.'"  Jones v. Gomez, 66 F.3d 199, 205
23 (9th Cir. 1995) (citing James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).
24 In the reply, movant makes more specific arguments regarding what the bankruptcy
25 transcript would have shown.  Movant argues that the bankruptcy transcript would have shown

---

[1] In the opposition, respondent states that a bankruptcy "adversary proceeding" was brought by the bankruptcy trustee for Azteca against movant for the funds he embezzled from Azteca. (P.S.R. § 10.)

8

that Martin did not testify truthfully at trial when he testified that movant was not authorized to use an Azteca credit card for personal use. (ECF No. 121 at 17.) Movant argues that he, movant, had the authority to use the Azteca credit card for personal expenses, and that the bankruptcy transcript will show that other Azteca employees were also authorized to use Azteca credit cards for personal expenses. (Id.)  Movant argues that at least one other Azteca employee, John McGrady, was authorized to use an Azteca credit card for personal expenses. (Id.)

Other than John McGrady, movant identifies no other Azteca employees who were allowed to use Azteca credit cards for personal expenses. At trial, evidence was presented that Azteca paid McGrady for the purchase of his business, in part, by allowing him to use the company credit card. Evidence was presented that Azteca employees were not allowed to use the company credit card for personal expenses.[2] Based on this evidence, movant's claim that McGrady was allowed to use the company credit card for personal expenses is misleading, as McGrady was allowed to do so pursuant to an agreement with Azteca for purchase of his business.

As indicated above, the jury heard evidence that John McCrady was permitted to use the Azteca credit card for personal expenses as part of the purchase agreement for his company. Movant has not demonstrated that any other Azteca employees were allowed to use Azteca cards for personal expenses. Accordingly, movant has not demonstrated that counsel was ineffective for failing to obtain a copy of the Azteca bankruptcy transcript.

B. Claim 2

Movant argues that a testifying I.R.S. agent failed to disclose Form 1099 tax forms issued by Azteca, Rolling Rock Construction or CERS, which showed a payment to movant and his

---

[2] Martin testified that Azteca employees were not permitted to use company credit cards for personal expenses. (ECF No. 98-1 at 10.) Martin testified that Azteca purchased McGrady's construction company. (Id. at 13.) Martin testified that McGrady was issued a company credit card, which he could use to purchase "anything he wanted" up to $3785 as part of the payment for the company. (Id. at 15-16.) McGrady also testified that part of the purchase price for his company included use of the Azteca company credit card for up to $3785 per month. (ECF No. 99-1 at 49-50.) Azteca office assistant Wolf also testified that McGrady was paid by way of use of the company credit card. (ECF No. 97-1 at 67.)

9

company, Cedar Creek Associates, for consulting services. (ECF No. 109 at 5.) Movant argues that while the prosecution argued that no agreement for consulting services existed between Azteca and movant, the 1099s forms proved that such an agreement existed. (Id.)

"There are three elements of a Brady/Giglio violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." United States v. Kohring, 637 F.3d 895, 901-02 (9th Cir. 2011) (quotation omitted). Prejudice means "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). To make this determination, the suppressed evidence is considered collectively in light of the other evidence in the case. Kyles, 514 U.S. at 436-37.

In the opposition, respondent correctly observes that movant has failed to establish that there was any 1099 information favorable to movant or that the government suppressed such information. Respondent states that the government obtained an ex parte order requiring production of existing tax information for movant and Cedar Creek Associates for the taxable periods 2002, 2003 and 2004. (ECF No. 114 at 12.) Respondent states that the I.R.S. produced tax information for 2002 through 2004 to the government and the same was produced to movant. (Id.) Respondent argues that none of the tax records produced by the I.R.S. included 1099s issued to movant by Azteca, CERS or Rolling Rock for 2003 and 2004. (Id. at 12-13.)

Respondent states that the I.R.S. records for 2002 showed that Azteca issued a 1099 to movant dba Cedar Creek for $6,326 and that Rolling Rock Construction issued a 1099 to movant for $24,916. (Id. at 13.) Respondent argues that of the over $190,000 in checks misappropriated by movant, one check for $7582 was misappropriated in 2002. (Id.) Respondent argues that based on that circumstance, is it unclear how this 2002 information would have been helpful to

1  movant as it does not explain the majority of funds diverted after 2002. (Id.) Respondent also
2  observes that this information was produced to movant's counsel. (Id.)

3    Based on the I.R.S. record obtained by respondent, and produced to movant's counsel, the
4  undersigned finds that movant has not demonstrated that the allegedly withheld 1099 forms exist.
5  Moreover, there is no evidence that the government suppressed any 1099 tax forms. For these
6  reasons, movant's Brady claim is without merit.

7    Respondent goes on to argue that movant's Brady claim also fails because movant had
8  knowledge of the alleged 1099s. If a Brady claims is based on "information already known to the
9  defense (or that could have been determined through reasonable diligence)," United States v.
10 Motta, 2012 WL 4633899 at *2 (D. Haw. Oct. 1, 2012), the evidence is not suppressed. See, e.g.,
11 Cunningham v. Wong, 704 F.3d 1143, 1154 (9th Cir. 2013) (finding that, because defendant's
12 attorneys possessed the "salient facts" to access the alleged Brady evidence, "[t]here was no
13 suppression of this easily attainable evidence"); United States v. Aichele, 941 F.2d 761, 764 (9th
14 Cir. 1991) ("When, as here, a defendant has enough information to be able to ascertain the
15 supposed Brady material on his own, there is no suppression by the government."). Because
16 movant claims that he had knowledge of the alleged 1099 forms, and in his reply claims that he
17 told his counsel about the forms, movant's Brady claim is without merit.

18   In his reply to the opposition, movant raises a new ineffective assistance of counsel claim
19 regarding the 1099 forms. Movant argues that he told his trial counsel about the 1099 forms.
20 (ECF No. 121 at 13.) Movant argues that his trial counsel was ineffective for failing to obtain
21 these forms. (Id.) Movant argues that 1099 forms were issued to movant or Cedar Creek in
22 1999, 2000, 2001 and 2003. (Id. at 12.) Movant argues that the forms from 1999, 2000 and 2001
23 would show a continuous pattern of movant or Cedar Creek being paid for consulting services.
24 (Id.)

25   For the following reasons, movant's new ineffective assistance of counsel claim is without
26 merit. First, movant is not permitted to raise new allegations in his reply. Moreover, movant's
27 unsupported assertion that the 2003 1099 form exists is contradicted by the evidence offered by
28 respondent that no such forms exist. For this reason, movant's claim alleging that counsel failed

to obtain the 2003 1099 form is without merit. See Womack v. Del Papa, 497 F.3d 998, 1004 (9th Cir. 2007) (ineffective assistance of counsel claim denied where, aside from his self-serving statement, which was contrary to other evidence in the record, there was no evidence to support his claim); Dows v. Wood, 211 F.3d 480, 486 (9th Cir. 2000) (noting that there was no evidence in the record to support petitioner's ineffective assistance of counsel claim, "other than from Dows's self-serving affidavit").

With regard to the alleged 1999, 2000 and 2001 1099 forms, evidence that movant received payment for consulting fees during these years would not have explained the majority of funds diverted after 2002. Therefore, assuming these forms exist, movant was not prejudiced by counsel's alleged failure to obtain these forms. Accordingly, this ineffective assistance of counsel claim is without merit.

C. Claim 6

Movant alleges that appellate counsel was ineffective in failing to move for a two point sentence reduction. (ECF No. 109 at 11.) The Strickland standard applies to appellate counsel as well as trial counsel. Smith v. Murray, 477 U.S. 527, 535-36 (1986).

The district court ordered movant to pay $44,715.21 in restitution for uncharged fraudulent credit card charges. (ECF No. 103 at 24.) On appeal, the government conceded that the district court erred by including the uncharged fraudulent credit card charges in restitution. (Id.) In the pending motion, movant argues that appellate counsel was ineffective for failing to seek a two-level reduction in his guideline range based on the reduction in restitution by $44,715.21. (ECF No. 109 at 11.) Movant argues that this reduction would have resulted in an overall loss amount of $196,837.99, which was below the $200,000 threshold for a twelve-point enhancement under the Sentencing Guidelines. (Id.)

Losses under the sentencing guidelines and restitution are determined by different standards. Movant's restitution was calculated under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. Under the MVRA, the district court is only authorized to order restitution for loss that flows directly from the conduct that is the basis of the conviction. U.S. v. May, 706 F.3d 1209, 1214 (9th Cir. 2013). Movant's credit card fraud, as conceded by the

12

government on appeal, was not part of the charged mail or bank fraud schemes and could not properly constitute part of the restitution order.

In contrast, in calculating loss for sentencing purposes, the district court may take into account all acts and omissions, including uncharged crimes, if they are "'sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'" U.S. v. Armstead, 552 F.3d 769, 779 (9th Cir. 2008) (quoting U.S.S.G. § 1B1.3, cmt. n. 9(B).) "Acts are part of the common scheme or plan if they are 'substantially connected to [the offense] by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi.'" Id. (quoting U.S.S.G. § 1B1.3, cmt. n. 9(a).) See also United States v. Fine, 975 F.2d 596, 600 (9th Cir. 1992) (stating that the "relevant conduct provisions ... taken together with the fraud and grouping provisions, mean that conduct which was part of the scheme is counted [when calculating a defendant's sentence], even though the defendant was not convicted of crimes based upon the related conduct").

As noted by respondent in the answer, movant's unauthorized use of the Azteca credit card was "substantially connected" to the charged check fraud. The uncharged credit card fraud and the charged check fraud involved the same victim (Azteca), a common purpose (unauthorized diversion of Azteca funds) and a similar modus operandi (abuse of movant's position of authority as Azteca's Vice President to use Azteca checks and credit cards for unauthorized personal expenditures). The uncharged credit card fraud was part of movant's "spree" to misappropriate money from Azteca. For these reasons, the losses associated with the uncharged credit card fraud were properly considered relevant conduct. Therefore, the aggregate loss exceeded $200,000.

Because the district court properly considered the uncharged credit card fraud in calculating loss, movant's appellate counsel was not ineffective for failing to seek a reduction in the guideline range based on the reduction in his restitution.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Movant's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (ECF No. 109) be denied; and

2. The Clerk of the Court be directed to close the companion civil case No. 2:14-cv-1243 WBS KJN.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If movant files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  October 26, 2016

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Tanke.257

14